UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 03-CIV-61063-MARTINEZ-SIMONTON

RICHARD FRESCO, CARLOS BARRETT,
JEFFREY HY, MARY ANN COLLIER, ROY
McGOLDRICK, ROBERT PINO, KENNETH
HERETICK, RUSSELL V. ROSEN and JOEL
LEVINE,

Plaintiffs,

vs.

AUTOMOTIVE DIRECTIONS, INC., a Wisconsin
Corporation; EXPERIAN INFORMATION
SOLUTIONS, INC., an Ohio corporation;
CHOICEPOINT SERVICES INC., a Georgia
corporation, CHOICEPOINT PUBLIC RECORDS
INC., a Georgia corporation; CHOICEPOINT INC.,
a Georgia corporation; CHOICEPOINT PRECISION
MARKETING INC., a Georgia corporation;
KNOWX LLC, a Georgia limited liability company;
SEISINT, INC., a Florida corporation; REED
ELSEVIER INC., a Massachusetts corporation; and
eFUNDS CORPORATION, a Delaware corporation,

Defendants.

**FINAL JUDGMENT AND ORDER ON MOTION
FOR ATTORNEY'S FEES AND COSTS**

This matter came before the Court upon Plaintiffs' Motion for Final Approval of Class

Action Settlement and Entry of Final Judgment and Order (D.E. No. 550), and Plaintiffs' Motion

1

for Attorneys' Fees and Expenses and Incentive Awards to Class Representatives[1] (D.E. No.

497). A hearing was held on both motions on October 24, 2007 (D.E. No. 610). This Court has

carefully considered all papers filed, including Plaintiffs' motions; the memoranda (including

affidavits) submitted by Plaintiffs in support of both motions (D.E. Nos. 551-1, 553); the

memoranda (including affidavits) submitted by Settling Defendants Automotive Directions, Inc.,

Experian Information Solutions, Inc., ChoicePoint Services Inc., ChoicePoint Public Records

Inc., ChoicePoint Inc., ChoicePoint Precision Marketing Inc., KnowX LLC, Seisint, Inc., Reed

Elsevier Inc., and eFunds Corporation ("Settling Defendants") in support of final approval of the

class action settlement (D.E. Nos. 579, 583); all written objections to Plaintiffs' motions

submitted by absent class members (D.E. Nos. 509, 517, 521, 525, 526, 528, 532, 535, 563, 580,

591); the evidence and arguments presented by Plaintiffs, Settling Defendants, and Objectors at

the October 24, 2007 hearing in this case (D.E. No. 610); and it is otherwise advised in the

premises.[2]

---

[1] The motion for attorneys' fees was initially referred to Magistrate Judge Simonton (D.E. Nos. 506, 515). Having consulted with Judge Simonton, and in the interests of judicial economy, however, the Court withdraws the reference. This Order will address both motions.

[2] The Court notes that on the basis of representations made by the parties in this case, the Eleventh Circuit has instructed the Court to bring this controversy to an end by entering Final Judgment in the present case (D.E. No. 622). If, however, this Court were to determine that the proposed class could not be certified or that the proposed class settlement was anything other than "fair, adequate and reasonable," this Court would be unable to enter Final Judgment at this stage in the proceedings. The potential conflict is moot, however, as the Court has approved the class and the settlement agreement.

## I. Findings of Fact and Conclusions of Law

**A.      Certification of the Class**

1.      A class may be certified "solely for the purposes of settlement where a settlement is reached before a litigated determination of the class certification issue." *Borcea v. Carnival Corp.*, 238 F.R.D. 664, 671 (S.D. Fla. 2006); *see also In re Beef Indus. Antitrust Litig.*, 607 F.2d 167, 173-78 (5th Cir. 1979).

2.      Whether a class is certified for settlement or for trial, the Court must find that the prerequisites for class certification under Rule 23(a) and (b) of the Federal Rules of Civil Procedure are met.  *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1314 (S.D. Fla. 2005).

3.      Rule 23(a) of the Federal Rules of Civil Procedure requires that the following requirements be met in order for a class action to be certified: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."[3]  Fed. R. Civ. P. 23(a).

4.      As discussed in this Court's earlier Order conditionally certifying the nationwide settlement class, the Court finds that the prerequisites for a class action pursuant to Federal Rules of Civil Procedure 23(a) have been satisfied in that:  (1) the number of Settlement Class Members is so numerous that joinder of all members thereof is impracticable; (2) there are questions of law and fact common to the Settlement Class; (3) the claims or defenses of the

---

[3] Courts often refer to these factors as numerosity, commonality, typicality, and adequacy. *See, e.g., Davis v. Coca-Cola Bottling Co.*, 516 F.3d 955, 966 (11th Cir. 2008).

Named Plaintiffs are typical of the claims or defenses of the Settlement Class; and (4) Named

Plaintiffs fairly and adequately protect the interests of the Settlement Class.

5.      Rule 23(b) of the Federal Rules of Civil Procedure provides that, once an action meets the

requirements of Rule 23(a), it may be maintained if it meets one of three additional requirements.

Defendants and Plaintiffs assert that this proposed class meets the requirements of Rule 23(b)(2):

"the party opposing the class has acted or refused to act on grounds that apply generally to the

class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting

the class as a whole." Fed. R. Civ. P. 23(b)(2).

6.      The predominant relief sought in a Rule 23(b)(2) class action must be "injunctive or

declaratory." *Murray v. Auslander*, 244 F.3d 807, 812 (11th Cir. 2001); *see also Ass'n for

Disabled Americans, Inc., v. Amoco Oil Co.*, 211 F.R.D. 457, 465 (S.D. Fla. 2002). Statutory

damage claims may be incidental to injunctive relief and do not preclude certification under Rule

23(b)(2). *Amoco*, 211 F.R.D. at 465; *Jones v. Diamond*, 519 F.2d 1090, 1100 n.17 (5th Cir.

1975).

7.      The Eleventh Circuit has defined "incidental damages" as "damages that flow directly

from liability to the class as a whole on the claims forming the basis of the injunctive or

declaratory relief. . . .   Ideally, incidental damages should be only those to which class members

automatically would be entitled once liability to the class (or subclass) as a whole is established."

*Murray v. Auslander*, 244 F.3d 807, 812 (11th Cir. 2001) (quoting *Allison v. Citgo Petroleum

Corp.*, 151 F.3d 402, 415 (5th Cir.1998)).  Damages that are not incidental are those individual

damages "to which [plaintiffs] would not be automatically entitled even if Defendants' liability to the class is established." *Id.* at 812.

8.      Under the Driver's Privacy Protection Act, 18 U.S.C. § 2721 *et seq.* ("DPPA"), statutory liquidated damages flow directly from a violation of the Act.  18 U.S.C. § 2724(b); *Kehoe v. Fidelity Fed. Bank & Trust*, 421 F.3d 1209, 1213 (11th Cir. 2005).  In fact, the Eleventh Circuit has expressly held that a plaintiff need not prove actual damages to receive statutory liquidated damages under the DPPA.  *Kehoe*, 421 F.3d at 1213.

9.      The statutory liquidated damage claims by the plaintiffs in this action represent damages to which each plaintiff would be automatically entitled if Defendants' liability to the class is established, because there is no requirement that plaintiffs prove actual damages in order to receive them.  *See id.*  Therefore, the statutory liquidated damage claims by Plaintiffs in this action are incidental to the injunctive relief they are seeking.  *See Murray*, 244 F.3d at 812. Moreover, the parties' settlement preserves any individual claims that class plaintiffs may have for actual damages,[4] claims which might otherwise have precluded certification under Rule 23(b)(2).  *See Amoco*, 211 F.R.D. at 465.  Thus, the proposed settlement class meets the requirement of Rule 23(b)(2).

10.     The Court accordingly certifies a Settlement Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2) defined as "all persons whose Personal Information or Highly Restricted Personal Information was obtained, used, or disclosed by any of the Settling Defendants from April 1, 1998, through Final Judgment."  This class definition utilizes the

---

[4] *See* Settlement Agreement and Release, Sec. IX.C. at 46 (D.E. No. 413-2).

definitions of "Personal Information" and "Highly Restricted Personal Information" contained in Settlement Agreement §§ II.T and GG (D.E. No. 413-2).  All federal judges and members of their families within the first degree of consanguinity, and officers and directors of the Settling Defendants, are excluded from the class definition.

11.     Due and adequate notice has been provided to members of the Settlement Class, as required by the Court's Preliminary Approval Order (D.E. No. 479).  The form and method of notice as so provided was designed to reach a significant number of Settlement Class Members.

**B.     Approval of Settlement Agreement**

12.     "[I]n class action suits, there is an overriding public interest in favor of settling," and the approval of a class action settlement is committed to the sound discretion of the Court.  *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977); *accord Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).

13.     In order to approve a class action settlement, the Court must find that the settlement is "not the product of collusion between the parties" and "is fair, adequate and reasonable." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984); *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1314 (S.D. Fla. 2005).  The Court, "absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." *Cotton*, 559 F.2d at 1330.

14.     The parties in this case spent four years in investigations, discovery, and litigation, and they spent nearly a year engaged in mediation.  The declaration by their mediator, Rodney A. Max, states that they engaged in arm's-length, intense, and contentious negotiations pursuant to this Court's order requiring mediation.  (Max Decl. ¶¶ 12-14, 15).  Max asserted, further, that

6

incentive awards and attorney fees were only negotiated after the parties agreed on the injunctive relief and release.  (Max Decl. ¶ 14).  Accordingly, the Court finds that there was no fraud or collusion between the parties.

15.    Factors to consider in determining whether a settlement is "fair, adequate and reasonable" include: "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved." *Bennett*, 737 F.2d at 986.  "In evaluating these considerations, the district court should not try the case on the merits." *Perez v. Asurian Corp.*, 501 F.Supp.2d 1360, 1380 (S.D. Fla. 2007) (quoting *Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534, 539 (S.D. Fla. 1988)).

16.    The Plaintiffs' likelihood of success at trial is not certain in this case.  The DPPA "sets forth three elements giving rise to liability, i.e., that a defendant (1) knowingly obtained, disclosed or used personal information, (2) from a motor vehicle record, (3) for a purpose not permitted." *Thomas v. George, Hartz, Lundeen, Fulmer, Johnstone, King, and Stevens, P.A.*, 525 F.3d 1107, 1111 (11th Cir. 2008).  A host of permissible uses are delineated in 18 U.S.C. § 2721(b).  The burden of demonstrating that the defendant used the information in an impermissible use falls on the plaintiff.  *Id.* at 1112.  The settling Defendants, who have superior knowledge of their own business practices, assert they used the information obtained in permissible ways.  Furthermore, some settling Defendants assert that they have evidence that their information came from non-regulated sources.  Thus, because success at trial is not certain

for Plaintiffs, this factor weighs in favor of accepting the settlement.

17.     "The second and third considerations of the *Bennett* test are easily combined." *Behrens*, 118 F.R.D. at 541.  In terms of the range of possible recovery, the DPPA provides that "[t]he court may award -- (1) actual damages, but not less than liquidated damages in the amount of $2,500; (2) punitive damages upon proof of willful or reckless disregard of the law; (3) reasonable attorney's fees and other litigation costs reasonably incurred; and (4) such other preliminary and equitable relief as the court determines to be appropriate."  18 U.S.C. § 2724(b). The Eleventh Circuit held in *Kehoe v. Fidelity Federal Bank & Trust*, 421 F.3d 1209 (11th Cir. 2005), that liquidated damages of $2,500 under § 2724(b)(1) do not require a showing of actual damages.  The Eleventh Circuit also stated, however, that the phrase "may award" in the statute indicates that "the district court, in its discretion, may fashion what it deems to be an appropriate award," which *as an option* may include the actual damages and liquidated damages provided for in 18 U.S.C. § 2724(b)(1).  *Kehoe*, 421 F.3d at 1217.  Other options for relief include punitive damages and equitable relief.  *Id.*  This proposed settlement and release does not encompass actual or punitive damages and preserves the right of individual plaintiffs to seek those damages. Therefore, because relief is awarded at the discretion of the district court, the range of possible recovery is up to $2,500 in statutory liquidated damages per plaintiff, injunctive relief, and attorneys' fees and costs.  Accordingly, the proposed settlement is within the range of possible recovery, because statutory damages are not mandatory recovery in a DPPA case .  *See id.*

        As stated in the third *Bennett* factor, even a settlement point below the range of possible recovery may qualify as fair, adequate, and reasonable.  *Bennett*, 737 F.2d at 986.  In this case,

the range of possible recovery may not include statutory liquidated damages.  In order to be fair, adequate, and reasonable, however, a settlement should at the least ensure compliance with the DPPA.  The proposed settlement offers injunctive relief that not only ensures compliance with the DPPA and DPPA state equivalents, but also provides for specific business practice changes and enhancements designed to protect the privacy of the class members.  Given the wide-ranging injunctive relief, the second and third *Bennett* considerations weigh in favor of approving the settlement.

18.     The complexity, expense, and duration of continuing litigation in this matter would be considerable, due to, among other things, the class size, disputes over class certification,[5] the scope of discovery, and unsettled elements in the construction of the DPPA.  Litigation to this point has already consumed large amounts of time, money, and judicial resources.  This factor weighs in favor of approving the settlement.

19.     In terms of the substance and amount of opposition to the settlement, approximately 43 class members filed approximately 19 objections to the proposed settlement agreement on the record.  Even assuming that some valid objections were not filed on the docket, this number represents less than a millionth of the entire class, which weighs in favor of approving the settlement.  *See, e.g., Figueroa v. Sharper Image Corp.*, 517 F.Supp.2d 1292, 1328 (S.D. Fla. 2007) ("[w]hile a low percentage of objections points to the reasonableness of a proposed settlement, a high percentage of objections signals that a proposed settlement is not fair or

---

[5] The Court notes that the certification of a class for the purpose of settlement will not necessarily result in the same outcome as "a litigated determination of the class certification issue."  *See Borcea v. Carnival Corp.*, 238 F.R.D. 664, 671-72 (S.D. Fla. 2006).

reasonable."); *Perez v. Asurian Corp.*, 501 F.Supp.2d 1360, 1382 (S.D. Fla. 2007) (considering the tiny percentage of objectors out of a large member class as weighing in favor of accepting the settlement); *Lipuma v. American Express Co.*, 406 F.Supp.2d 1298, 1324 (S.D. Fla. 2005) (same). No state or federal government officials have filed objections.

In substance, these objections focused most often on the proposed attorneys' fees, which the Court discusses, *infra*, Sec. D, and on the fact that the settlement waives statutory damages. Some class members, however, objected over other matters, including that, under Rule 23(b)(2) class certification, they cannot opt out of the class; that class members should have received direct mail notice; that the injunctive relief was inadequate; that injunctive relief does not require that Defendants change their use and disclosure of DPPA-protected materials; that the settlement should not foreclose on the ability to pursue actual damages in a second class action; that injunctive relief does not apply to three Defendants who are going out of business; that the incentive awards are too large; and that the named class representatives do not represent the interests of a nationwide class.

The Court finds that these objections do not merit denying the settlement. For the reasons discussed above and in this Court's earlier Order preliminarily approving the class settlement, the Court has found that class certification under Rule 23(b)(2) is appropriate; that notice was adequate; and that the named class representatives do represent the interests of the class. Although the manner in which Settling Defendants obtained DPPA-regulated information may have been different in states other than Florida, those different circumstances do not render the named class representatives inadequate to represent the interests of the nationwide class in

preventing unauthorized use of DPPA-regulated information, nor do those differences significantly alter the merits of the claim or the remedies available for unauthorized use. Moreover, having reviewed the proposed settlement, the Court finds that the injunctive relief it offers is not illusory or inadequate and does serve to protect the plaintiffs' privacy interests.[6]

Class members' objections that a waiver of the right to pursue further DPPA class actions is unconscionable is without merit. All of the cases cited by objectors dealt with waivers of the right to pursue collective action in arbitration agreements and were analyzed under state law on unconscionability. This Court is not aware of any binding authority holding that parties may not waive such rights in a settlement agreement.

With respect to the waiver of statutory rights, the Court does not find that the waiver of the statutory damages is sufficient to render the proposed settlement agreement unfair, inadequate, or unreasonable. Nonetheless, the Court is sympathetic to class members' frustration

---

[6] Some objectors have asserted that three Settling Defendants, Automotive Directions, ChoicePoint Precision Marketing Inc., and ChoicePoint Inc., have provided no consideration for the waiver of claims against them. *See* (D.E. No. 588). These Settling Defendants are treated differently under the settlement agreement because the former two have confirmed through discovery that they are not currently obtaining, using, or disclosing DPPA-regulated information and because the latter Settling Defendant, Choicepoint, Inc., has warranted that it has never been in the business of obtaining, using, or disclosing DPPA-regulated information. *See* (D.E. 553 at 8 n.11). The Court notes that these Defendants have provided consideration under the settlement. Automotive Directions and Choicepoint Precision Marketing Inc. are purging all DPPA-regulated information from their systems and then hiring an independent, third-party assessor to confirm that the purge has taken place. Choicepoint, Inc., is providing information to confirm that it never possessed DPPA-regulated materials. All three Defendants have agreed to implement the full multi-faceted injunctive relief program covered in the settlement in the event that they ever obtain DPPA-regulated information in the future or release a DPPA-regulated product. *See* Settlement Agreement and Release, Sec. VI.C-E (D.E. No. 413-2). These actions undertaken by these Settling Defendants, which hinge entirely upon the fact that Defendants are not presently violating the DPPA and will not do so in the future, provide consideration for the waiver.

with the loss of statutory damages.  Thus, the Court concludes, weighing the paucity of

objections against the objectors' legitimate interest in their statutory damages, that this *Bennett*

factor is neutral.

20.     "A court evaluates the stage of the proceedings at the time of settlement to ensure that the

plaintiffs have access to sufficient information to adequately evaluate the merits of the case and

weigh the benefits of the settlement against further litigation."  *Perez v. Asurian Corp.*, 501

F. Supp. 2d 1360, 1383 (S.D. Fla. 2007).  The parties in this case had conducted substantial

investigation and discovery before a settlement agreement was reached.  The stage of

proceedings at which the parties agreed to settle this matter supports the fairness of the

settlement.

21.     Accordingly, the Court concludes that five out of the six *Bennett* factors support a finding

that the settlement is "fair, adequate, and reasonable" and, thus, support approving the settlement.

## C.     Incentive Awards

Under circumstances where a private class action suit serves as a weapon to enforce "laws

designed for the protection of the public," "[c]ourts have found it appropriate to specially reward

named class plaintiffs for the benefits they have conferred."  *Pinto v. Princess Cruise Lines, Ltd.*,

513 F. Supp. 2d 1334, 1344 (S.D. Fla. 2007).  The DPPA is certainly a law designed for the

protection of the public.  Class counsel have asserted that the class representatives participated in

discovery, actively followed the case, and participated in the negotiation phase over the course of

the five years this case has been pending (D.E. No. 497 at 21).  Thus, the Court approves the

requested $15,000.00 incentive awards for the class representatives.

**D.     Attorneys' Fees and Costs**

1.      As discussed above, the DPPA is a statute that permits an award of "reasonable attorney's fees and other litigation costs reasonably incurred" to prevailing plaintiffs.  18 U.S.C. § 2724(b). "The court's order on attorney's fees must allow meaningful review—the district court must articulate the decisions it made, give principled reasons for those decisions, and show its calculation." *Norman v. Housing Authority of City of Montgomery*, 836 F.2d 1292, 1304 (11th Cir. 1988) (citing *Adams v. Mathis*, 752 F.2d 553, 554 (11th Cir.1985)).

2.      As part of their settlement agreement, after negotiating the substantive terms of the settlement, the parties agreed that Class Counsel for the Plaintiffs should apply to the Court for an award of attorney's fees and costs of $25,000,000.00, which Settling Defendants would not oppose (D.E. No. 551-2 at 41-42).  The proposed award for costs and fees is to be paid separately, not out of any common fund with class members.  The settlement agreement recognizes that the Court may award less, and its terms provide for that eventuality (D.E. No. 551-2 at 43-45).  This shows a recognition of the fact that, although the parties have negotiated attorney's fees up to $25,000,000, "the district court has a supervisory role and ultimately must calculate and set the attorneys' fees award up to a maximum of the [negotiated] cap." *Dikeman v. Progressive Exp. Ins. Co.*, No. 07-10547, 2008 WL 786618 at *2 n.3 (11th Cir. 2008).  "A district court is not bound by the agreement of the parties as to the amount of attorneys' fees.  In fixing the amount of attorneys' fees the court must, of course, take all [appropriate] criteria into account, including the difficulty of the case and the uncertainty of recovery.  [The Court] is not, however, merely to ratify a pre-arranged compact." *Piambino v. Bailey*, 610 F.2d 1306, 1328

13

(5th Cir. 1980) (internal citations omitted).[7]

3.      Class counsel represent that the following lodestar calculations apply, divided by firm:

     a.      James, Hoyer, Newcomer & Siljanich, P.A. (D.E. No. 499)

| Professional | Rate | Hours | Total |
|---|---|---|---|
| Senior Partner | $550.00 | 2936.4 | $1,615,020.00 |
| Partner | $500.00 | 2079.3 | $1,039,650.00 |
| Associate | $400.00 | 147.9 | $59,160.00 |
| Associate | $350.00 | 428.9 | $150,115.00 |
| Associate | $300.00 | 39.2 | $11,760.00 |
| Investigator | $200.00 | 2360.6 | $472,120.00 |
| Paralegal | $130.00 | 368.3 | $47,879.00 |

Total: $3,422,924.00 in fees and $234,763.54 in costs

James, Hoyer, Newcomer & Siljanich, P.A., also requested $200.00 an hour for 136.1 hours worked by a member of their IT personnel, Walter Elly. Typically, however, "reasonable attorney's fees" in fee-shifting federal statutes must reflect "rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation," and "a fee that would have been deemed reasonable if billed to affluent plaintiffs by their own attorneys." *Missouri v. Jenkins*, 491 U.S. 274, 286 (1989) (internal quotations and citations omitted). Thus, attorneys' fees may include hourly billing for paralegals and law clerks, given that the prevailing practice in the community is to bill their time separately at market rates. *Id.* at

---

[7] *See Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting all decisions of the former Fifth Circuit announced prior to October 1, 1981, as binding precedent in the Eleventh Circuit).

14

286-87.  On the other hand, it is presumed that attorneys' fees themselves incorporate and cover

the costs of other workers, such as "secretaries, messengers, librarians, janitors, and others whose

labor contributes to the work product for which an attorney bills her client."  *Id.* at 285.  It is not

the practice in this market for attorneys to bill clients a separate hourly rate for the work of the

firm's IT personnel.  "Any hours the attorneys would not bill to their client may not be charged to

their adversary."  *Resolution Trust Corp. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th

Cir. 1993).  Compensation for Mr. Elly's work is presumably already included in the hourly fee

for the attorneys.  Thus, the Court finds that the DPPA provision for awarding reasonable

attorney's fees and costs does not permit an award of an hourly fee for IT personnel.

      b.      Devine Goodman Pallot Rasco & Wells, P.A. (D.E. No. 500)

| Professional | Rate | Hours | Total |
|---|---|---|---|
| Partner | $475 | 1,570.15 | $745,821.25 |
| Associate | $325 | 172.7 | $50,276.00 |
| Paralegal | $120 | 105.5 | $12,397.50 |

Total: $808,494.75 in fees and $8,560.18 in costs

      c.      David Welch Law Offices (D.E. No. 501)

| Professional | Rate | Hours | Total |
|---|---|---|---|
| Attorney | $375 | 1484.25 | $556,593.75 |

Total: $556,593.75 in fees and $6,913.16 in costs

d.      James K. Green, P.A. (D.E. No. 502)

| Professional | Rate | Hours | Total |
|---|---|---|---|
| Attorney | $500 | 1,086.2 | $543,100.00 |

Total: $543,100.00 in fees

e.      Portley & Sullivan[8] (D.E. No. 503)

| Professional | Rate | Hours | Total |
|---|---|---|---|
| Attorney | $350 | 944.1 | $330,435.00 |

Total: $330,435.00 in fees

f.      Searcy Denney Scarola Barnhart & Shipley, P.A. (D.E. No. 505)

| Professional | Rate | Hours | Total |
|---|---|---|---|
| Managing Partner | $750 | 216.2 | $162,150.00 |
| Partner | $450 | 356.4 | $160,380.00 |
| Associate | $400 | 14 | $5,600.00 |
| Paralegal | $200 | 98 | $19,600 |

Total: $347,730 in fees and $45,234.84 in costs

---

[8] Where, as here, there is a discrepancy between the amount summarized in the motion submitted by all Class Counsel and the amount attested to in counsel's affidavit, the Court has presumed that the discrepancy resulted from a scrivener's error in the motion and that the amount attested to in the affidavit is correct. *See* (D.E. No. 503).

g.      Aranovitz Jaffe (D.E. No. 498)

| Professional | Rate[9] | Hours | Total |
|---|---|---|---|
| Senior Lawyer | $535.950563 | 4126.5 | $2,211,600.00 |
| Associate | $262.112676 | 266.25 | $69,787.50 |
| Law clerk | $85 | 82 | $6,970.00 |
| Paralegal | $75 | 357.25 | $26,793.75 |

Total: $2,315,151.25 in fees and $230,382.66 in costs

Class Counsel's proposed calculation of the lodestar fee for their legal services is,

therefore, $8,324,428.75.  Their calculation of total costs is $525,854.38.  Thus, in order to reach

a total of $25,000,000, Class Counsel have requested that their fees be increased by a multiplier

of approximately three.

4.      With respect to that lodestar figure, the $750 an hour billed by Searcy Denney's

managing partner, John Scarola, Esq., is $200 an hour more than the next highest rate requested

by any class counsel of any level.  Mr. Scarola is an experienced and highly successful trial

---

[9] The affidavit submitted by this firm with respect to their fees did not specify billing rates, merely hours worked and the total fees requested for the different levels of legal professionals.  "A lodestar is calculated by multiplying the number of hours reasonably spent times a reasonable hourly rate." *Resolution Trust*, 996 F.2d at 1149 (citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565, 106 S.Ct. 3088, 3098 (1986)).  Thus, it is not appropriate for a party to skip the reasonable hourly rate and merely provide the Court with the desired total.  Furthermore, simple arithmetic shows that the desired billing rates for both partners and associates, reached by dividing the proposed fee by the number of hours worked, cannot be expressed as integers.  The Court notes that it is, to say the least, extremely unusual for a firm to bill clients anything other than an even dollar amount per hour and virtually unheard of for a firm to bill in fractions of cents per hour.  As no parties have objected to the firm's calculation, however, and as the proposed total divided by the hours worked is not too high to qualify as a reasonable hourly rate, the Court will accept the rates as represented by implication in the affidavit.

attorney, but $750 is an unusually high hourly rate for these services in this legal community. Accordingly, the Court will reduce this amount to $600.00, which is a reasonable rate. That reduces the total Searcy Denney fees to $315,300 and the total lodestar fees for class counsel to $8,291,998.75. The Court otherwise finds that, given the prodigious amount of expertise and effort required during the four and a half years this case was litigated, the hours reported and rates requested are reasonable for the purposes of calculating the lodestar amount. *See* (D.E. Nos. 498-505).

5.      With respect to the requested multiplier, class counsel have asserted that the multiplier is warranted because 1) the litigation was novel and undesirable; 2) class counsel bore significant risk and financial burden due to the contingent nature of the fee; 3) this litigation required significant legal acumen; 4) the requested fee is customary for this type of case; 5) the results achieved provide substantial benefits to class members; and 6) a lodestar analysis supports the reasonableness of the fee requested. (D.E. No. 497).

6.      "The 'lodestar' figure has, as its name suggests, become the guiding light of our fee-shifting jurisprudence. [The Supreme Court has] established a 'strong presumption' that the lodestar represents the 'reasonable' fee . . . and [has] placed upon the fee applicant who seeks more than that the burden of showing that 'such an adjustment is necessary to the determination of a reasonable fee." *City of Burlington v. Dague*, 505 U.S. 557, 567 (1992) (quoting *Blum v. Stenson*, 465 U.S. 886, 898, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984)).

6.      "Enhancement for contingency is not permitted under the fee-shifting statutes. . . ."

18

*Dague*, 505 U.S. at 567.[10]  The Court notes that, although *Dague* was not a class-action case, the Supreme Court's reasoning for denying enhancements for contingency risks applies equally to class-action cases.  The Supreme Court stated in *Dague* that an attorney's risk of loss in a contingency case was based upon "(1) the legal and factual merits of the claim, and (2) the difficulty of establishing those merits."  *Id.* at 562.  The Supreme Court reasoned that awarding enhancements based on the financial risk presented by the legal and factual merits of a case would "provide attorneys with the same incentive to bring relatively meritless claims as relatively meritorious ones."  *Id.* at 563.  The difficulty in establishing the merits of the case was already reflected in the lodestar in terms of extra hours or a higher rate.  *Id.*  This reasoning applies to class action suits as well as to those that are not.  Furthermore, the Eleventh Circuit has cited *Dague* in rejecting contingency enhancements in class-action cases, even those resolved by the settlement of the parties.  *See Kenny A. ex rel. Winn v. Perdue*, 532 F.3d 1209, 1228, 1248 (11th Cir. 2008).  Accordingly, the Court will not enhance the lodestar figure because of the risks class counsel undertook in accepting this case on a contingency basis.

7.      The Supreme Court has stated that "novelty and complexity of the issues, the special skill and experience of counsel, the quality of representation, and the results obtained from the litigation are presumably fully reflected in the lodestar amount, and thus cannot serve as independent bases for increasing the basic fee award."  *Pennsylvania v. Delaware Valley*

---

[10]  The Court notes that the DPPA was not one of the fee-shifting statutes at issue in *Dague*.  *See Dague*, 505 U.S. at 559.  In *Dague*, however, the Supreme Court noted that the language of the attorney fee statutes at issue in that case was "similar to that of many other federal fee-shifting statutes; our case law construing what is a 'reasonable' fee applies uniformly to all of them."  *Id.* at 562; *see also Kenny*, 532 F.3d at 1224 n.5.

*Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986).  Subsequent Eleventh Circuit

precedent has, however, established that "exceptional" results—results that are "out of the

ordinary, unusual, or rare"— may result in an enhancement.  *Norman v. Housing Authority of*

*Montgomery*, 836 F.2d 1292, 1302 (11th Cir.1988).  "*Any* enhancement begins with a finding

that the results were exceptional."  *Id.* at 1306 (emphasis added).  "Even if the court found the

results obtained to be exceptional, no enhancement for these results would be justified unless the

court also finds that class counsel's representation was superior to that which would have been

expected considering the rates requested."  *Id.* (citing *Blum*, 465 U.S. at 899).  In other words, in

order to award attorney's fees in excess of the lodestar, the Court must find that "the superb

quality of their representation *far exceeded what could reasonably be expected for the standard*

*hourly rates* used to calculate the lodestar."  *Kenny A. ex rel. Winn v. Perdue*, 547 F.3d 1319,

1324 (11th Cir. 2008) (Wilson, J., concurring ) (emphasis in original).

8.      The results plaintiffs obtained in this case include no money damages for the unnamed

plaintiffs, who might have recovered up to $2,500.00 in statutory damages pursuing claims on

their own.  Those plaintiffs are now foreclosed from pursuing further statutory damages, and they

are also foreclosed from using a class action to pursue their actual damages.  While this

settlement is "fair, adequate, and reasonable," it is not "exceptional," as required by the Eleventh

Circuit's holding in *Norman*, nor does it "far exceed[] what could reasonably be expected for the

standard hourly rates used to calculate the lodestar."  Without a finding that the result was

exceptional, an enhancement is not permitted.  *Norman*, 836 F.2d at 1306.

9.      The other bases for enhancement put forth by Class Counsel are matters already taken

into account by the Court in calculating the lodestar. *See Blum*, 465 U.S. at 899; *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974) (listing twelve factors to be considered in awarding fees, which may be considered in calculating the lodestar or enhancing it), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989). Specifically, the legal acumen required by counsel for this case and the customary fee charged in this type of case are both reflected in the hourly rates which the Court has approved. The factors put forth by Class Counsel in arguing that this litigation was "novel and undesirable," such as the undeveloped nature of the law and the esoteric and technical aspects of the case, were reflected in both the hours approved and the hourly rates. The Court finds that the lodestar calculation provides reasonable compensation under the DPPA.

10.     With respect to costs, Rule 23(h) of the Federal Rules of Civil Procedure permits an award of nontaxable costs that are "authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). No objections have been raised against Class Counsel's accounting of their costs. The Court will, therefore, award costs in the amount of $525,854.38. It is therefore

        **ORDERED AND ADJUDGED** that:

        1.     The Orders of Reference (D.E. Nos. 506, 515) referring the motion for attorney's fees and costs (D.E. No. 497) to Judge Simonton is WITHDRAWN.

        2.     Plaintiffs' Motion for Attorneys' Fees and Expenses and Incentive Awards to Class Representatives (D.E. No. 497) is **GRANTED IN PART** and **DENIED IN PART**. The Court will award $8,291,998.75 in attorney fees and $525,854.38 costs, as well as incentive awards in the amount of $15,000.00 to each class representative: Richard Fresco, Carlos Barrett,

21

Jeffrey Hy, Mary Ann Collier, Roy McGoldrick, Robert Pino, Kenneth Heretick, Russell V. Rosen, and Joel Levine.  The Settling Defendants shall pay the award of attorneys' fees and expenses to Class Counsel and incentive awards to the class representatives in accordance with the terms contained within the Settlement Agreement.

3.      For purposes of this Final Judgment and Order, the Court adopts and incorporates the definitions and meanings of the defined terms set forth in § II of the parties' December 20, 2006 Settlement Agreement and Release ("Settlement Agreement") (D.E. No. 413-2).

4.      Plaintiffs' Motion for Final Approval of Class Action Settlement and Entry of Final Judgment and Order (D.E. No. 550) is **GRANTED**.

5.      Except as otherwise provided in this Order, the Court expressly approves each and every term contained in the parties' Settlement Agreement (D.E. No. 413-2), and finds that the Settlement is, in all respects, fair, reasonable, and adequate to members of the Settlement Class. The Court directs the implementation of that Settlement Agreement pursuant to its terms and conditions, and orders that the Named Plaintiffs, members of the Settlement Class, and Settling Defendants are each to comply with each and every term of the Settlement Agreement.

5.      Injunctive Relief:  Except as provided elsewhere in this Final Judgment and Order, the provisions of § 5 of this Final Judgment and Order apply only to Settling Defendants Experian Information Solutions, Inc., ChoicePoint Services Inc., ChoicePoint Public Records Inc., KnowX LLC, Seisint, Inc., Reed Elsevier Inc., and eFunds Corporation.  As provided in Settlement Agreement § VI.B, each of these Settling Defendants is required to comply with the following:

22

5.1.   <u>Compliance with Law</u>

a.      Settling Defendants are obtaining, and will continue to obtain, DPPA Regulated Information for themselves or their customers only in accordance with the DPPA and the DPPA State Equivalents.

b.      Settling Defendants are using, and will continue to use, DPPA Regulated Information for themselves or their customers only in accordance with the DPPA and the DPPA State Equivalents.

c.      Settling Defendants are disclosing, and will continue to disclose, DPPA Regulated Information only in accordance with the DPPA and the DPPA State Equivalents.

d.      Because 18 U.S.C. § 2721(c) permits resale and redisclosure for all permissible uses of the information (except for 18 U.S.C. § 2721 (b)(11) or (b)(12)) in whatever format, Settling Defendants may continue to resell or disclose DPPA Regulated Information only as permitted by the DPPA and the DPPA State Equivalents.

5.2.   <u>Internal Assessment Mechanism</u>

a.      Each Settling Defendant will conduct a confidential internal assessment to evaluate its compliance with the DPPA.

b.      Each Settling Defendant will conduct the confidential internal assessment within 180 days following the Effective Date.

c.      The confidential internal assessment of each Settling Defendant will be conducted under the auspices of its General Counsel's Office, and any documents or other

work product generated by that confidential internal assessment will be protected by all applicable privileges or protections, including but not limited to the attorney-client privilege and the self-evaluative privilege.

        d.     Each Settling Defendant will provide a confidential report of the internal assessment to its senior management within 30 days from its completion.

        e.     Each Settling Defendant will evaluate the internal assessment and will address any material deficiencies identified in the assessment in implementing its DPPA Compliance Program (discussed below).

     5.3.    <u>DPPA Compliance Program</u>

        a.     Each Settling Defendant will have a written DPPA Compliance Program that will be approved by senior management or its designee within the earlier of 60 days of the report of the internal assessment to senior management or 240 days of the Effective Date.

        b.     Each Settling Defendant shall designate a DPPA Compliance Director who will oversee its DPPA Compliance Program on an ongoing basis.  The DPPA Compliance Director will report to senior management.  The DPPA Compliance Director will be independent and objective in that the DPPA Compliance Director may have other responsibilities, so long as those other responsibilities do not conflict with his or her role as DPPA Compliance Director.

        c.     Within 180 days from approval of the DPPA Compliance Program, the DPPA Compliance Director will report to senior management that the DPPA Compliance Program has been implemented.  The DPPA Compliance Director will continue to oversee the

implementation of the DPPA Compliance Program and make adjustments to the DPPA

Compliance Program as necessary to address any material deficiencies.

        d.    Each Settling Defendant's DPPA Compliance Program will be

periodically reviewed no less than annually and updated as appropriate by the DPPA Compliance

Director or his or her designee.  The DPPA Compliance Director shall provide a written

confidential report to the company's General Counsel's Office and senior management, and any

documents or other work product generated by that periodic review, including but not limited to

the written report, will be protected by all applicable privileges or protections, including but not

limited to the attorney-client privilege and the self-evaluative privilege.

        5.4.   <u>Written Procedures</u>

        a.    Each Settling Defendant shall have written procedures for its

DPPA Compliance Program that will be designed to enable each Settling Defendant to identify:

(i) existing DPPA Products; (ii) DPPA Products undergoing material modifications, if

applicable; and (iii) DPPA Products under development for commercial release.

        b.    Each Settling Defendant shall have written procedures for its

DPPA Compliance Program that will govern each Settling Defendant's DPPA Compliance

Review of its existing DPPA Products:  (i) for conducting a DPPA Compliance Review; (ii) for

determining compliance with any restrictions imposed by the DPPA and the DPPA State

Equivalents; (iii) for determining whether modifications that materially alter existing DPPA

Products are in compliance with the DPPA and the DPPA State Equivalents; (iv) for determining

whether the implementation of a product design complies with the DPPA and the DPPA State

Equivalents; (v) for requiring that modifications implemented prior to review due to necessity or emergency be reviewed for compliance with the DPPA and the DPPA State Equivalents as soon as reasonably practicable after implementation; and (vi) for communicating the DPPA Compliance Program and the employee's role relative to the program to employees involved in the design or material modification of DPPA Products.

        c.      Each Settling Defendant shall have written procedures for its DPPA Compliance Program that will govern the DPPA Compliance Review before commercial release of any new product in a manner or method materially different from existing DPPA Products:  (i) for identifying DPPA Products under development and intended for commercial release; (ii) for conducting a DPPA Compliance Review before commercially releasing any new product; (iii) for applying the DPPA Compliance Program to the design and development of any new product under development and intended for commercial release; and (iv) for communicating the DPPA Compliance Program and the employee's role relative to the program to employees involved in the design and development of DPPA Products under development and intended for commercial release.

        d.      Each Settling Defendant shall have written procedures for its DPPA Compliance Program that will require each Settling Defendant to include language in customer contracts authorizing access to DPPA Products, entered into after the implementation of the DPPA Compliance Program:  (i) requiring customers to maintain the confidentiality of the DPPA Regulated Information provided and to use it only for purposes permitted by the DPPA; (ii) permitting the Settling Defendant to take remedial action if it becomes aware of evidence

indicating that one of its customers may have used DPPA Regulated Information in a manner not permitted by the DPPA; and (iii) requiring customers to identify their DPPA permitted use.

e.       Each Settling Defendant shall have written procedures for its DPPA Compliance Program that will require each Settling Defendant, in the event of amendments to the DPPA, to review its customer contracting practices to maintain compliance with the DPPA.

f.       Each Settling Defendant shall have written procedures for its DPPA Compliance Program that will require each Settling Defendant to educate employees whose job responsibilities materially relate to DPPA Regulated Information regarding the DPPA Compliance Program:  (i) for communicating the DPPA Compliance Program to employees whose job responsibilities materially relate to the design and development of DPPA Products; (ii) for communicating the DPPA Compliance Program to employees involved in the sale, training, and customer service of DPPA Products; (iii) for communicating material changes in the DPPA Compliance Program to employees whose job responsibilities materially relate to DPPA Regulated Information; and (iv) for requiring employees with access to DPPA Regulated Information to sign a Confidentiality and Nondisclosure Agreement.

g.       Each Settling Defendant shall have written procedures for its DPPA Compliance Program that will require each Settling Defendant to address suspected DPPA non-compliance issues in accordance with the DPPA Compliance Program.

h.       Each Settling Defendant shall have written procedures for its DPPA Compliance Program that will require each Settling Defendant to publish information

regarding how consumers may contact their state DMV to correct inaccurate information in their

Motor Vehicle Records.

        i.     Each Settling Defendant shall have written procedures for its

DPPA Compliance Program that will require each Settling Defendant to perform confidential

compliance checks of customers' use of DPPA Products, done under the auspices of the General

Counsel's Office, which may include:  (i) reviewing the customer's use of DPPA Regulated

Information; (ii) identifying actions to be taken as a result of the compliance check, if any; and

(iii) recording the date of the compliance check and the action taken, if any.

        j.     Each Settling Defendant shall have written procedures for its

DPPA Compliance Program that will require each Settling Defendant to comply with 18 U.S.C.

§ 2721(c) to maintain a record, for five years from the date of disclosure of DPPA Regulated

Information, that contains:  (i) the identity of the customer; (ii) the date of disclosure; and (iii) the

DPPA permissible use identified by the customer to access the DPPA Regulated Information.

        k.     Each Settling Defendant shall have written procedures for its

DPPA Compliance Program that will require each Settling Defendant to have reasonable written

customer credentialing procedures for DPPA Products:  (i) for registering and authorizing new

customers; (ii) for developing minimum requirements to qualify for access to Personal

Information; (iii) for developing minimum requirements to qualify for access to Highly

Restricted Personal Information; (iv) for modifying an existing customer's access to DPPA

Products where necessary; (v) for ceasing a customer's access to DPPA Products where the

Settling Defendant becomes aware of information indicating that the customer no longer

qualifies for access to such DPPA Products; and (vi) for updating customer profiles and permissible uses when necessary.

l.     Each Settling Defendant shall have written procedures for its DPPA Compliance Program that will require each Settling Defendant to address suspected DPPA non-compliance issues involving the Settling Defendant's employees:  (i) for identifying employees whose job responsibilities materially relate to DPPA Products; (ii) for reporting suspected non-compliant employee activity; (iii) for conducting a confidential review of the suspected non-compliant activity under the auspices of the General Counsel's Office; and (iv) for taking remedial or corrective action in response, if necessary.

m.     Each Settling Defendant shall have written procedures for its DPPA Compliance Program that will require each Settling Defendant to review and update the DPPA Compliance Program:  (i) for determining the appropriate periodic review interval, which shall occur at least annually; (ii) for identifying the individual or group charged with review; and (iii) for identifying changes in the DPPA and the DPPA State Equivalents.

n.     Each Settling Defendant shall have written procedures for its DPPA Compliance Program that will require each Settling Defendant to apply the DPPA Compliance Program to a newly acquired business or entity if the new business or entity obtains, uses, or discloses DPPA Regulated Information, including:  (i) procedures to review the existing practices of the acquired business or entity in light of the DPPA Compliance Program; (ii) application of the DPPA Compliance Program to existing DPPA Products at the acquired business or entity within a commercially reasonable time after the acquisition; and (iii)

29

identification of the individual or group responsible for conducting the review and noting compliance with the DPPA Compliance Program.

    5.5.   <u>Customer Procedures</u>

    a.   Each Settling Defendant will inform its customers of DPPA Products of applicable permitted use requirements of the DPPA.  Upon request of a customer, each Settling Defendant shall provide an explanation of the appropriate uses of DPPA Regulated Information and general types of users qualified to access DPPA Regulated Information.

    b.   Each Settling Defendant will include in customer contracts authorizing access to DPPA Products entered into after the implementation of the DPPA Compliance Program provisions that:  (i) require its customers to maintain the confidentiality of the DPPA Regulated Information provided; (ii) require its customers to use DPPA Regulated Information only for purposes permitted by the DPPA; and (iii) provide that access to DPPA Regulated Information may be terminated if the Settling Defendant becomes aware of information indicating that the customer used DPPA Regulated Information in an impermissible way.

    c.   Each Settling Defendant will make available to its customers, upon request, the language of the DPPA.

    5.6.   <u>Assessment by the Independent, Third-Party Assessor</u>

    a.   After the completion of the steps outlined above, each Settling Defendant will engage an Independent, Third-Party Assessor to assess the Settling Defendant's

written procedures for its DPPA Compliance Program, referred to in Section 5.4, above, and to confirm that the procedures have been implemented ("First Assessment").

          b.      The assessment by the Independent, Third-Party Assessor will occur three times:  the First Assessment will begin 60 days from the date the DPPA Compliance Director reports to senior management that the DPPA Compliance Program has been implemented as outlined in Section 5.3.c, above; and the last two assessments will occur at the 24-month ("Second Assessment") and 48-month ("Final Assessment") anniversaries of completion of the First Assessment.

          c.      The Independent, Third-Party Assessor retained by each Settling Defendant to assess its compliance with the Injunctive Relief will be qualified (1) to perform evaluations under the American Institute of Certified Public Accountants (AICPA) framework, (2) as a Certified Information System Security Professional (CISSP), (3) as a Certified Information Systems Auditor (CISA), (4) as a Certified Information Privacy Professional (CIPP), or (5) as a Global Information Assurance Certification (GIAC) from the Sysadmin, Audit, Network, Security Institute (SANS), or qualified by a similar organization.

          d.      Each Settling Defendant shall provide to Class Counsel a list of prospective Independent, Third-Party Assessors that meet the qualifications described in Section 5.6.c, above.  Within fourteen days of receipt of the above-described list, Class Counsel shall identify in writing and provide a reasonable basis for excluding any person or entity on the list.

e.      The Independent, Third-Party Assessor will be provided, subject to an agreement to protect proprietary and confidential information, with a list of written procedures that each Settling Defendant will have adopted for its DPPA Compliance Program.

f.      The Independent, Third-Party Assessor will evaluate whether each Settling Defendant's DPPA Compliance Program addresses the issues referred to in Section 5.4, above, and whether the program has been implemented.

g.      Within 30 days of commencing each assessment, the Independent, Third-Party Assessor will provide to the Compliance Director a confidential report setting forth his, her, or its preliminary conclusions as to each Settling Defendant.

h.      After receiving the Independent, Third-Party Assessor's confidential report setting forth his, her, or its preliminary conclusions, each Settling Defendant will then have a reasonable period of time to address or remedy any potential issues raised by the Independent, Third-Party Assessor.

i.      The Independent, Third-Party Assessor will then reassess material deficiencies, if any, and provide to the subject Settling Defendant, and to the Court filed under seal, and to Class Counsel, a summary of his, her, or its report in the form set forth below within 20 days after initiating the reassessment.

j.      The provisions of Sections 5.6.e through 5.6.i shall apply to the First, Second, and Final Assessments.

k.      The report of the Independent, Third-Party Assessor for the First Assessment shall be in substantially the following form:

32

To the Management of [Settling Defendant Company]:

We were engaged by [Settling Defendant Company] as an Independent, Third-Party Assessor to assess [Settling Defendant Company]'s written procedures for its DPPA Compliance Program and its implementation of those procedures. We are qualified to make this assessment [Independent, Third-Party Assessor to pick one of the following: (1) under the American Institute of Certified Public Accountants (AICPA) framework, (2) as a Certified Information System Security Professional (CISSP), (3) as a Certified Information Systems Auditor (CISA), (4) as a Certified Information Privacy Professional (CIPP), or (5) as a Global Information Assurance Certificated (GIAC) assessor from the Sysadmin, Audit, Network, Security Institute (SANS), or qualified by a similar organization.]

We have examined management's assertion that [Settling Defendant Company] has instituted a DPPA Compliance Program that meets the Injunctive Relief requirements established in the Final Judgment and Order entered by the Court in <u>Richard Fresco, et al. v. Automotive Directions, Inc., et al.</u>, Case No. 03-cv-61063-MARTINEZ/SIMONTON, filed in the United States District Court for the Southern District of Florida. This assertion is the responsibility of [Settling Defendant Company]. Our responsibility is to express an opinion based on our examination.

Our examination was conducted by obtaining an understanding of the Injunctive Relief requirements set forth in the Final Judgment and Order; by reviewing the DPPA Compliance Program adopted by [Settling Defendant Company] to satisfy the Injunctive Relief requirements of that Order; and by reviewing [Settling Defendant Company]'s policies and procedures. We believe that our examination provides a reasonable basis for our opinion.

[Settling Defendant Company] has provided us with the written procedures [Settling Defendant Company] adopted as part of its DPPA Compliance Program, and the company [is / is not] implementing those procedures. Based upon our assessment, [Settling Defendant Company] [is / is not] meeting its Injunctive Relief obligations as set forth specifically in the Final Judgment and Order. Additionally, [Settling Defendant Company] has conducted a confidential internal assessment; has created a written

DPPA Compliance Program overseen by a designated DPPA Compliance Director, and which includes written procedures governing [Settling Defendant Company]'s DPPA compliance with new and existing products and customer procedures and employee education designed to enhance DPPA compliance; and [is / is not] in compliance with its obligations as set forth specifically in the Injunctive Relief provisions of the Final Judgment and Order entered in this cause.

In our opinion, [Settling Defendant Company]'s management's assertion referred to above [is / is not] fairly stated, in all material respects.

l.      The report of the Independent, Third-Party Assessor for the Second and Final Assessments shall be in substantially the following form:

To the Management of [Settling Defendant Company]:

This report is in follow-up to our prior [date of first assessment] report regarding [Settling Defendant Company]'s DPPA Compliance Program, and ongoing obligations set forth in that Program.

Specifically, we were engaged by [Settling Defendant Company] as an Independent, Third-Party Assessor to assess [Settling Defendant Company]'s written procedures for its DPPA Compliance Program and its implementation of those procedures. We are qualified to make this assessment [Independent, Third-Party Assessor to pick one of the following:  (1) under the American Institute of Certified Public Accountants (AICPA) framework, (2) as a Certified Information System Security Professional (CISSP), (3) as a Certified Information Systems Auditor (CISA), (4) as a Certified Information Privacy Professional (CIPP), or (5) as a Global Information Assurance Certified (GIAC) assessor from the Sysadmin, Audit, Network, Security Institute (SANS), or qualified by a similar organization].

We have examined management's assertion that [Settling Defendant Company] has instituted [and is currently maintaining] a DPPA Compliance Program that meets the Injunctive Relief requirements in the Final Judgment and Order entered by the Court

34

in <u>Richard Fresco, et al. v. Automotive Directions, Inc., et al.</u>, Case No. 03-cv-61063-MARTINEZ/SIMONTON, filed in the United States District Court for the Southern District of Florida. This assertion is the responsibility of [Settling Defendant Company]. Our responsibility is to express an opinion based on our examination.

Our examination was conducted by obtaining an understanding of the Injunctive Relief requirements set forth in the Final Judgment and Order; by reviewing the DPPA Compliance Program adopted by [Settling Defendant Company] to satisfy the Injunctive Relief requirements of that Order; and by reviewing [Settling Defendant Company]'s policies and procedures. We believe that our examination provides a reasonable basis for our opinion.

[Settling Defendant Company] has provided us access to the DPPA Compliance Director, and relevant, material, non-privileged documents or information as we have specifically requested to allow the completion of this assessment. Based upon our assessment, [Settling Defendant Company] [continues to meet / has not met] its obligations as set forth specifically in the Injunctive Relief provisions of the Final Judgment and Order.

5.7.   <u>Employee Education</u>

a.   Each Settling Defendant will provide employee education as outlined in the DPPA Compliance Program.

b.   Each Settling Defendant will communicate the DPPA Compliance Program (and any material changes) to employees whose job responsibilities materially relate to DPPA products within a reasonable time after commencement of the DPPA Compliance Program.

c.   Each Settling Defendant will require employees whose job responsibilities materially relate to DPPA Products to confirm their agreement to comply with the DPPA Compliance Program.

d.      Each Settling Defendant will require employees with access to DPPA Regulated Information to sign a Confidentiality and Nondisclosure Agreement.

e.      Each Settling Defendant will address employee non-compliance with the DPPA Compliance Program, as set forth in Section 5.4.l, above.

5.8.    Procedures For Corrective Action

Each Settling Defendant will institute processes for addressing DPPA non-compliance issues in accordance with Section 5.4, above.

5.9.    Sunset Provision

a.      The obligations of Section 5.1 of the Injunctive Relief (Compliance with Law) will extend ten (10) years from the Effective Date.

b.      The obligations of Section 5.2 (Internal Assessment Mechanism) will be required only once, consistent with the timeframe set forth in Section 5.2 above.

c.      Section 5.3-Section 5.8 will extend seven (7) years from the Effective Date.

6.      Injunctive Relief Applicable To Settling Defendant Automotive Directions:  As provided in § VI.C of the Settlement Agreement, Settling Defendant Automotive Directions, Inc. is enjoined as follows:

6.1.    Pursuant to this Final Judgment and Order, Automotive Directions shall purge all remaining Personal Information and Highly Restricted Personal Information from Motor Vehicle Records, as defined in 18 U.S.C. § 2725(3) and (4), from its files.

6.2.     After the destruction of all DPPA Regulated Information, Automotive Directions will engage an Independent, Third-Party Assessor to assess, one time, whether Automotive Directions:  (i) has destroyed its DPPA Regulated Information; (ii) is not obtaining, using, or disclosing DPPA Regulated Information; and (iii) has not transferred any DPPA Regulated Information to any parent or sister subsidiary.

6.3.     The Independent, Third-Party Assessor hired by Automotive Directions to assess its compliance with this section will be qualified (1) to perform evaluations under the American Institute of Certified Public Accountants (AICPA) framework, (2) as a Certified Information System Security Professional (CISSP), (3) as a Certified Information Systems Auditor (CISA), (4) as a Certified Information Privacy Professional (CIPP), or (5) as a Global Information Assurance Certification (GIAC) from the Sysadmin, Audit, Network, Security Institute (SANS), or qualified by a similar organization.

6.4.     The Independent, Third-Party Assessor will provide to Automotive Directions, and to the Court filed under seal, and to Lead Class Counsel, a report indicating whether or not Automotive Directions:  (i) has destroyed its DPPA Regulated Information; (ii) is not obtaining, using, or disclosing DPPA Regulated Information; and (iii) has not transferred any DPPA Regulated Information to any parent or sister subsidiary.

6.5.     In the event that Automotive Directions releases a product regulated by the DPPA or begins obtaining, using, or disclosing DPPA-Regulated Information, then Automotive Directions agrees that it will comply with the obligations of the Injunctive Relief set forth in Paragraph 5 above and § VI.B of the Settlement Agreement before releasing that product.

7.      Injunctive Relief Applicable To Settling Defendant ChoicePoint Precision

Marketing Inc.:  As provided in § VI.D of the Settlement Agreement, Settling Defendant

ChoicePoint Precision Marketing Inc. ("CPPM") is enjoined as follows:

7.1.    This Final Judgment and Order shall have the effect of a judicial waiver

from the DPPA's requirement that CPPM keep its DPPA data for 5 years, and, accordingly,

CPPM shall destroy all remaining DPPA Regulated Information contained within its files.

7.2.    After the destruction of all DPPA Regulated Information, CPPM will

engage an independent third party to assess, one time, whether CPPM:

a.      Has destroyed its DPPA Regulated Information; and

b.      Is not obtaining, using or disclosing DPPA Regulated Information.

7.3.    The third party hired by CPPM to assess its compliance with this section

will be qualified (1) to perform evaluations under the American Institute of Certified Public

Accountants (AICPA) framework, (2) as a Certified Information System Security Professional

(CISSP), (3) as a Certified Information Systems Auditor (CISA), (4) as a Certified Information

Privacy Professional (CIPP), or (5) as a Global Information Assurance Certification (GIAC) from

the Sysadmin, Audit, Network, Security Institute (SANS), or qualified by a similar organization.

7.4.    The independent third party will provide to CPPM, and to the Court (filed

under seal), and to Lead Class Counsel, a report indicating whether or not CPPM:

a.      Has destroyed its DPPA Regulated Information;

b.      Is not obtaining, using or disclosing DPPA Regulated Information;

and

c.      Has not transferred any DPPA Regulated Information to any parent or sister subsidiary.

7.5.    In the event that CPPM releases a product regulated by the DPPA or begins obtaining, using or disclosing DPPA-Regulated Information, then CPPM agrees that it will comply with the Injunctive Relief outlined in Paragraph 5 above and § VI.B of the Settlement Agreement before releasing that product.

8.      <u>Injunctive Relief Applicable To Settling Defendant ChoicePoint Inc.</u>:  As provided in § VI.E of the Settlement Agreement, Settling Defendant ChoicePoint Inc. is enjoined as follows:

8.1.    ChoicePoint Inc. will engage an independent third party to confirm, one time, that ChoicePoint Inc. does not obtain, disclose or use DPPA Regulated Information.

8.2.    The third party hired by ChoicePoint Inc. to assess its compliance with this section will be qualified (1) to perform evaluations under the American Institute of Certified Public Accountants (AICPA) framework, (2) as a Certified Information System Security Professional (CISSP), (3) as a Certified Information Systems Auditor (CISA), (4) as a Certified Information Privacy Professional (CIPP), or (5) as a Global Information Assurance Certification (GIAC) from the Sysadmin, Audit, Network, Security Institute (SANS), or qualified by a similar organization.

8.3.    The independent third party will provide to ChoicePoint Inc., and to the Court (filed under seal), and to Lead Class Counsel a report indicating whether or not ChoicePoint Inc. does obtain, use, or disclose DPPA Regulated Information.

8.4.    In the event that ChoicePoint Inc. releases a product regulated by the DPPA or begins obtaining, using, or disclosing DPPA-Regulated Information, then ChoicePoint Inc. agrees that it will comply with the obligations of the Injunctive Relief outlined in Paragraph IV above and § VI.B of the Settlement Agreement before releasing that product.

9.    Commencement Of Injunctive Relief

Pursuant to § VI.A of the Settlement Agreement, the Settling Defendants shall commence the Injunctive Relief set forth in Paragraphs 5-8 above within 30 days of the Effective Date as defined in the Settlement Agreement.

10.    Limitations On Injunctive Relief

Any action by Settling Defendants to comply with any federal, state or local law, enactment, regulation, or judicial ruling shall not constitute a breach of the Settlement Agreement or a violation of this Final Judgment and Order.  In the event that any obligation that Settling Defendants have agreed to undertake in the Injunctive Relief becomes unlawful under any future federal, state or local law, enactment, regulation, or judicial ruling, then Settling Defendants shall be released from performing such obligation.

11.    Release

11.1.    As provided in § IX of the Settlement Agreement, upon the Effective Date the Released Parties are fully, finally, and forever released and discharged from any and all equitable claims, known or unknown, arising on or before the Effective Date that Plaintiffs and the Settlement Class had based on:  (1) the DPPA; (2) any DPPA State Equivalents; or (3) any Settling Defendants' obtainment, use, or disclosure of DPPA Regulated Information.  Upon the

Effective Date, the Released Parties also are fully, finally, and forever released and discharged from any and all Claims, known or unknown, arising on or before the Effective Date that Plaintiffs and the Settlement Class had for: (1) statutory liquidated damages under the DPPA or DPPA State Equivalents; and (2) punitive damages predicated on either the equitable Claims or statutory-liquidated-damages Claims referenced herein. Plaintiffs and the Settlement Class also expressly waive and fully, finally, and forever settle and release any known or unknown, suspected or unsuspected, contingent or noncontingent Claims with respect to the Released Claims, whether or not concealed or hidden, without regard to the subsequent discovery or existence of other, different, or additional facts. As used in this Final Judgment and Order, the term "Released Parties" shall have the definition set forth in §§ II.KK and IX.A of the Settlement Agreement.

11.2    Plaintiffs and all members of the Settlement Class are hereby permanently barred and enjoined from instituting, maintaining, or prosecuting, either directly or indirectly, any lawsuit that asserts Released Claims.

11.3.    Plaintiffs and all members of the Settlement Class are hereby permanently barred and enjoined from seeking to use the class action procedural device in any future lawsuit against any Released Party, where the lawsuit asserts Claims that were or could have been brought in the Litigation prior to the entry of this Final Judgment and Order and that are not otherwise released and discharged by the Settlement Agreement.

11.4.    Plaintiffs and all members of the Settlement Class do not release and discharge, but instead preserve, the right of Settlement Class Members to file individual lawsuits

under the DPPA or DPPA State Equivalents for actual monetary damages sustained before the Effective Date, subject to the waiver of the class action procedural device described in Paragraph 11.3 above and § IX.B of the Settlement Agreement.  In addition, Plaintiffs and all members of the Settlement Class do not release and discharge, but instead preserve, the right of Settlement Class Members to seek (in individual lawsuits under the DPPA or DPPA State Equivalents) punitive damages based on actual monetary damages, subject to the waiver of the class action procedural device described in Paragraph 11.3 above and § IX.B of the Settlement Agreement.

12.     This action is dismissed with prejudice and the Court directs the entry of Final Judgment pursuant to Federal Rules of Civil Procedure 54 and 58.

13.     The Court reserves continuing and exclusive jurisdiction over the parties with respect to all matters relating to this Settlement, including the administration, interpretation, effectuation, and enforcement of the Settlement Agreement and this Final Judgment and Order.


DONE AND ORDERED in Chambers at Miami, Florida, this 16th day of January, 2009.


_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE